IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs March 24, 2021

**STATE OF TENNESSEE v. BYRON SIDNEY DOSS**

**Appeal from the Criminal Court for Davidson County**
**No. 2019-A-679          Mark J. Fishburn, Judge**

**No. M2020-00934-CCA-R3-CD**

The Defendant, Byron Sidney Doss, was convicted after a bench trial of false imprisonment, a Class A misdemeanor, and aggravated assault involving strangulation, a Class C felony. See Tenn. Code Ann. §§ 39-13-102(A)(iv), -13-302. The trial court imposed an effective sentence of five years, suspended to time served plus five years on supervised probation. On appeal, the Defendant contends that the trial court imposed an excessively long five-year sentence. After our review, we affirm and remand the case for the entry of corrected judgment forms.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed;**
**Case Remanded**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT H. MONTGOMERY, JR., JJ., joined.

Timothy P. Carter, Nashville, Tennessee, for the appellant, Byron Sidney Doss.

Herbert H. Slatery III, Attorney General and Reporter; Katherine C. Redding, Assistant Attorney General; Glenn R. Funk, District Attorney General; and Lody R. Powers, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

FACTUAL BACKGROUND

This case arises from a December 15, 2018 incident at the Defendant's trailer, during which the Defendant strangled his pregnant ex-girlfriend, LaPorsha Whitney, and refused to allow her to leave the home. Thereafter, the Davidson County Grand Jury charged the Defendant with aggravated kidnapping, aggravated assault involving

strangulation, and aggravated assault with a deadly weapon.   See Tenn. Code Ann. §§ 39-13-102, -13-304.   The Defendant waived his right to a trial by jury on November 21, 2019, and a bench trial occurred on April 28, 2020.

The State's evidence at trial consisted of testimony from the victim about the altercation, testimony from Douglas and Anita Holt, the Defendant's neighbors who called the police, testimony from police officers about the victim's injuries and the circumstances of the Defendant's arrest, and the victim's medical records.   The sole defense witness was Stanley Jerome Green, one of the Defendant's housemates.

The testimony at trial established that in August 2018 when the victim was seventeen years old, she ran away from home.   The victim lived at multiple locations, including her grandmother's house and a foster home, before she came to stay with the Defendant.   The Defendant, who was forty-one years old, owned a trailer and had two housemates.   The victim said that her mother visited the trailer often, that her mother was a close friend of Mr. Green, and that her mother "loved" the Defendant as well.   After a night of drinking, the victim and the Defendant began a romantic relationship.   The victim stayed with the Defendant for a period of weeks, during which time she became pregnant.   Eventually, the victim left due to unspecified reasons; the victim noted that although the Defendant spoke rudely to her and was "verbally aggressive," she was in love with the Defendant and that he was a "good man" with a "good heart."

In December 2018, after the victim had turned eighteen, she returned to the trailer. The victim and Mr. Green gave differing testimony about the circumstances that led to her staying there again and whether the Defendant was expected to be present at the trailer.   In any event, the Defendant came home the first night after the victim's return, and the victim and the Defendant attempted to reconcile during the course of about one week.   The victim was eighteen weeks pregnant during the relevant incident in this case, and she averred that the Defendant had been informed of the pregnancy.   The victim stated that she was employed and that although she did not have a car or a driver's license, she knew how to drive.

On December 15, 2018, the victim woke up when a female friend of hers, who had spent the night at the trailer, left.   The victim vomited due to morning sickness, which she said was common; the Defendant woke up, cleaned up the victim, and went back to sleep. The victim stated that when the Defendant woke a second time, their interactions "were good until they weren't."   The Defendant apologized to the victim and stated that "he just wanted to hurt [the victim] like [she] hurt him[.]"   The victim said, though, that she was "done, officially done, wanted to leave."   The victim noted that she assured the Defendant

that she would not keep her baby[1] from him but that she did not wish to continue their romantic relationship; the Defendant asked whether they could work out their issues, and the victim responded negatively. The victim had gathered her belongings and video-called a friend with her cell phone to ask the friend to arrange transportation for the victim. Although the victim's friend ordered a ride-share driver to pick up the victim, when the car arrived, the Defendant prevented the victim from exiting the trailer, and the car left.

As the Defendant and the victim argued, the Defendant poured a bottle of Mountain Dew on the victim's head, and he later threw eggs and poured a bottle of water on her. The victim noted that she also poured drinks on the Defendant during this time, but she maintained that he was the first of them to engage in the behavior. The Defendant took the victim's cell phone and refused to return it; at some point, he hid the cell phone in his bedroom and the victim found it, then called her mother. The Defendant again took the victim's cell phone.

The Defendant blocked the bedroom doorway so that the victim could not leave. In response, the victim threw a vase at the Defendant, which landed in the hallway, and started to "beat on him." The Defendant "wrestled" with the victim, holding her arms so that she could not strike him, and he tried to convince the victim to stay using "sweet-talk." When this approach was unsuccessful, the Defendant called the victim "all types of B words." The victim threatened to "mess up everything in the house" if the Defendant did not allow her to leave. The victim knocked over a television and end table, but the Defendant seemed unconcerned about his belongings. Although the victim still did not have her cell phone, she threatened to call the police.

When the victim attempted to walk through the trailer's front door, the Defendant grabbed the hood of the victim's sweatshirt and "yanked" her back inside twice. She recalled the Defendant's saying that she would hurt herself if she left and her reply that he was the only one hurting her. The second time the Defendant pulled the victim inside, she fell to the ground on her back, and the Defendant held her down with his knee on her lower body. The Defendant pressed his forearm against the victim's chest and neck; she described the amount of pressure as a nine out of ten. The victim estimated that the Defendant choked her for about thirty seconds because her mouth started watering and she saw small dots; she described that it was difficult for her to breathe and that the more

---

[1] The victim noted that she was not completely certain of her baby's paternity but that she had ordered a DNA test at the time of trial.

pressure the Defendant applied, the "fuzzier [she] got." The victim believed she was going to die; she "kind of blacked out"; and she urinated on herself.[2]

The victim told the Defendant that she would stop fighting; when the Defendant allowed her to get up, the victim told the Defendant that she needed to go to the bathroom; in the bathroom, the victim noted "spotting," or vaginal bleeding, and that she was afraid she would miscarry.[3] The victim averred that she informed the Defendant that she had urinated on herself and that she was bleeding.

The victim resolved to leave and retrieved a knife from the kitchen. The victim told the Defendant that she would stab or kill him if he came any closer. The Defendant took the knife from her and responded that he would stab himself, and the victim became frightened. She noted that she still cared about the Defendant and did not want him to kill himself. The victim asserted that the Defendant's threat to stab himself was meant to convey that he was not afraid of the knife. The victim opined that the Defendant did not care about the lives of himself or the victim and her unborn child.

The victim waited until the Defendant went into a bathroom, and she ran to the back door; the Defendant caught her, dragged her back inside, and closed and locked the door.[4] The victim again tried to fight the Defendant, but then told him that she was "going to just sit down and chill." The Defendant placed the television back on its stand, and the victim returned to the living room and sat on the couch, turned on the television, and put chicken in a "dry fryer," although she did not turn on the machine. The victim stated that at some point thereafter, the Defendant held her down on the couch and again used his forearm to strangle her; she noted that the pressure he used was a "seven out of ten." The victim stated that she was "so scared"; the Defendant eventually stopped applying pressure, looked "real sad," and repeatedly apologized to the victim.

When the Defendant eventually went to take a shower, the victim ran from the trailer up a hill toward a neighbor's house; the Defendant chased the victim onto the neighbor's porch. The Defendant arrived at the porch as the victim was "beating on" the door, but no

---

[2] The victim stated that she urinated on herself when describing two incidents of strangulation. However, contextually, she seemed to indicate that the urination only occurred once.

[3] The victim did not ultimately miscarry; the record reflects that an ultrasound examination at the hospital was normal, and the victim's child was present in the courtroom during her testimony.

[4] Although the precise sequence of events was unclear, the victim later described a similar incident during which she ran outside, flagged down a passing motorist, and asked to use the driver's cell phone while the Defendant stood nearby. The cell phone did not function, and the victim returned the phone to the driver, who left. The Defendant led the victim back inside the trailer.

–4–

one was home; she noted that she was tired and that the Defendant tried to grab her arm and pull her back to the trailer. The Defendant asked the victim if she was going to leave without her cell phone and told her, "[I]t's cool, it's just okay."

As the Defendant walked the victim toward the trailer, the victim saw Douglas and Anita Holt, who were also the Defendant's neighbors, standing outside their home. Mr. and Ms. Holt testified they heard the victim "forcefully" calling for help. They saw the Defendant and the victim standing on their mutual neighbors' front porch up the hill from the Holts' house. The victim quickly walked down the hill toward the Holts; she appeared to be "very anxious," stressed, and "[t]ense," and was limping and holding her side. The victim testified that she told the Holts that the Defendant had "put his hands on" her, that she was pregnant and bleeding, and that the Defendant was harassing her. The Defendant stood in the street and told the Holts that the victim was crazy and that the Defendant had been speaking to the victim's mother on the telephone. Ms. Holt went inside and called the police; the recorded 911 call was played and reflected that the victim complained of pain in her abdomen, neck, chest, and leg, as well as vaginal bleeding. The victim, who was audibly upset in the recording, stated that the Defendant had held a knife to her neck.

The Defendant left, and the victim indicated to the Holts that she was injured. Mr. Holt opined that the victim seemed to be "in imminent danger," and he felt a sense of urgency based upon the victim's request for help and her demeanor. Both Mr. and Ms. Holt said that the victim was "disheveled," though Mr. Holt denied noticing any redness in her eyes, and Ms. Holt denied that the victim's hair was wet or contained a sticky substance. Ms. Holt stated that the victim mentioned wanting to call her family and not having access to her telephone. The victim told Ms. Holt that the Defendant was her child's father and that he had put a knife to her neck. When asked whether the victim's voice was raspy, Ms. Holt stated that the victim's "voice did seem tense at first" but that after they called the police, all of them calmed down. The victim estimated that the entire incident lasted "no more than two hours."

The victim went to the hospital, where it became apparent that she had bruising on her neck, arms, and thighs. The victim's medical records from the hospital indicated that she had petechiae or hemorrhaging in both eyes, injuries to her clavicles, and an abrasion to the "side of [her] lower neck" that measured four centimeters by three centimeters; the victim denied that she had any injuries before the incident.

The victim testified that after the incident in this case, she received calls from a jail, but that she did not accept them; she noted that "a lot of people" called her from jail. She denied receiving any emails from the Defendant.

The victim denied that the Defendant was abusive or that he had "put his hands on" her previously. She opined that the Defendant had "the biggest heart ever" and averred that the incident "just happened."

Mr. Green testified on the Defendant's behalf that the victim never told him that she and the Defendant were having relationship troubles. However, Mr. Green acknowledged that he was not present when the incident in this case occurred. He noted that he drove the victim to the preliminary hearing and heard a portion of her testimony, although she would not discuss the incident with him in private. Mr. Green stated that he "stayed out of it because [he] really didn't know what happened."

Mr. Green testified that the Defendant called him from jail and asked Mr. Green to reach out to the victim, although he did not recall whether the Defendant asked him to prevent the victim from testifying in court. After refreshing his recollection with the audio recording of a jail telephone call,[5] Mr. Green acknowledged his voice on the recording but stated that he did not remember the conversation. Mr. Green further acknowledged that in the recording, the Defendant asked him to talk to the victim, but he averred that he never tried to persuade her "one way or the other[.]" He admitted that in another telephone recording, the Defendant "sound[ed] like" he "asked [Mr. Green] to basically take care of his problem" and "[d]o whatever it took even if it meant to pay off [the victim] so she wouldn't show up at a trial[.]" Mr. Green agreed that he and the Defendant had been friends for several years, but he denied that he would do "whatever it [took]" to keep the Defendant out of trouble. The State introduced as evidence Mr. Green's criminal record, which included multiple felonies. Mr. Green denied pressuring or bribing the victim in response to the Defendant's requests. The jail telephone calls were played for the trial court.

The trial court found relative to Count 1, aggravated kidnapping, that although the Defendant was "without any doubt whatsoever" guilty of aggravated kidnapping resulting in bodily injury, he had been indicted for aggravated kidnapping involving the intent to commit serious bodily injury. The court found that the evidence did not establish that the Defendant intended to inflict serious bodily injury on the victim, finding that although the strangulation could have led to serious bodily injury, the Defendant had "total control" of the situation for several hours and his intent was to keep the victim there. The court found the Defendant guilty of the lesser-included offense of false imprisonment.

Relative to Count 2, aggravated assault, the trial court noted that the statute required strangulation or attempted strangulation and that no physical visible injury was required.

---

[5] The compact disc containing the recorded calls included in the record did not function. However, the trial testimony about the content of the conversation is adequate for purposes of our review.

–6–

The court credited the victim's testimony about the strangulation, finding that the Defendant knew that he could impede the victim's ability to breathe by placing his arm across her neck. The court also found that the petechiae in the victim's eyes were caused by the strangulation and not by her vomiting before the incident. The court found the Defendant guilty of aggravated assault by strangulation.

The trial court found that the Defendant was not guilty in Count 3, aggravated assault using the knife, finding that the evidence only established that the Defendant held the knife to his own neck and that the knife was never used in an "assaultive manner" toward the victim. The court found that the Defendant was not guilty of any lesser-included offenses and dismissed Count 3.

At the sentencing hearing, Davidson County Corrections Officer Justin Kubasti testified regarding an April 3, 2020 incident in which the Defendant assaulted Officer Kubasti and another corrections officer after returning to the jail from a medical appointment; during the altercation, the Defendant attempted unsuccessfully to wrap his arm around Officer Kubasti's neck in a "guillotine chokehold."

Metro Nashville Police Officer Rodney Phipps testified that on December 26, 2018, he and thirty officers served the Defendant's arrest warrants. The Defendant hid in the back of the trailer and refused to come out until a SWAT team entered and removed him.

The presentence report was entered as an exhibit and reflected that the forty-two-year-old Defendant had previous convictions in Tennessee and Texas for two misdemeanor thefts, felony theft, possession of drug paraphernalia, criminal trespass, three assaults, and possession of forgery tools. It was noted that a felony probation violation had been filed on January 8, 2019, as a result of his arrest in this case. The Defendant admitted to using alcohol and marijuana occasionally; he also tested positive for cocaine and marijuana in a November 2018 drug screen. The Strong-R Assessment indicated that the Defendant was a high risk for violence; he was rated as having high needs relative to "Attitudes/Behaviors," "Aggression," "Residential," "Family," and "Employment." The Defendant reported having eight children, five of whom were minors; the Defendant denied that he paid any child support.

Angelina Doss, the Defendant's aunt, testified that she helped raise the Defendant until he was about ten years old, when he moved to Texas with his mother. The Defendant's trailer was a gift from his father, and Ms. Doss knew that the Defendant had previously worked laying carpet. Ms. Doss communicated with the Defendant once or twice per month before the incident. Ms. Doss described the Defendant as an outgoing person who loved his family. She stated that the Defendant had four or five children, some of whom lived in Tennessee. Ms. Doss was not aware that the Defendant had a criminal

history. She averred that the Defendant had familial support for transportation and payment of any fines.

The trial court also noted that several family members had submitted letters on the Defendant's behalf, which were received as a collective exhibit. The family members generally averred that the Defendant had a good heart and came from a good family; other than the Defendant's mother, the family members were generally cousins, aunts, and uncles. Many of the family members indicated that they had not seen the Defendant for some time, and it was unclear where the family members lived and how often they had contact with the Defendant. The Defendant's mother wrote that she wanted the Defendant to take an anger management class.

The trial court stated that it considered the evidence at trial and the sentencing hearing, the presentence report, including the Strong-R assessment, mitigating and enhancement factors, arguments regarding alternative sentencing, the nature and characteristics of the criminal conduct, statistical information from the Administrative Office of the Courts regarding sentencing practices for similar offenses, the character letters submitted on the Defendant's behalf, the Defendant's potential for rehabilitation and treatment, and the statutory purposes of sentencing. The court found that the Defendant was a Range I, standard offender and noted that the average Range I sentence for aggravated assault was forty-eight to forty-nine months.

Relative to enhancement factors, the trial court found that the Defendant had a previous history of criminal convictions in addition to those necessary to establish his offender classification. Tenn. Code Ann. § 40-35-114(1). The court noted that the Defendant was convicted of three assaults in Austin, Texas in the 1990s, as well as trespass, driving with a suspended license, possession of unlawful drug paraphernalia, misdemeanor theft, and felony theft in Davidson County. The court also applied enhancement factor (13), that the Defendant was on probation at the time he committed the offenses. Tenn. Code Ann. § 40-35-114(13). The court declined to find that the victim was particularly vulnerable due to her age and noted that the victim was employed around the time of the incident. Tenn. Code Ann. § 40-35-114(4) The court noted the presence of a knife during the incident, but gave it "very little weight" because the Defendant never acted aggressively toward the victim with the knife. The court found that no mitigating factors applied.

Relative to alternative sentencing, the trial court found that the Defendant had no mental or physical condition that would prevent him from successfully completing an alternative sentence. The court noted that the Defendant's work and educational history reflected "little evidence that he's made use of any skills that he may have" and that considering the Defendant's age, his lack of work history was "a very negative reflection

on his ability to serve an alternative sentence." The court found that although the Defendant's family were "hard-working, God-fearing, family-oriented people," the court did not "see any of that" in the Defendant.

The trial court found relative to the Defendant's character and social history that notwithstanding the victim's positive remarks about the Defendant, the facts of the case spoke to the Defendant's character; the court noted the Defendant's "motivation to have a young woman for his mate" and the position of influence that arose from the age disparity between the victim and the Defendant. The court found that the Defendant was not doing "much in life other than hanging around the trailer and having a good time with his friends." The court concluded that the Defendant's social history contained "nothing . . . that [was] positive in nature."

The trial court found that it did not know where the Defendant's family lived or how much they were in a position to help him. The court noted that the Defendant had "gone in a different direction in lifestyle" than his family and that the Defendant had not "shown behavior indicative of the way he was raised." The court expressed doubt about how much influence the Defendant's family would have on him.

The trial court found that the Defendant had previously violated probation twice, noting that the Defendant violated probation and "picked up" another violation before the court hearing regarding the first violation. The court stated that the Defendant had never successfully completed probation. The court acknowledged that the Defendant had admitted to marijuana and alcohol use, which did not "seem to be significant."

The trial court found relative to measures necessary to reduce the likelihood of future criminal activity that the Defendant needed to work, which "seem[ed] to evade his grasp." The court noted that the Defendant's record of criminal activity included new arrests and institutional write-ups; the court found that the Defendant's "physical altercation" with the correction officers was contrary to the "lack of aggression that he and his family present[ed.]" The court stated that it made no finding about the Defendant's candor because he did not testify at trial or at the sentencing hearing.

The trial court found relative to the responsibility the Defendant demonstrated in providing emotional support to any immediate family or dependents that the Defendant had never been married and had eight children, although no information was provided regarding the Defendant's involvement with his children. The court noted that this factor did not "reflect positively" on him. The court considered the effects of the Defendant's conduct on the victim and found that although the incident still affected the victim, it had not caused her "any type of disability." The court found that if the Defendant were the

–9–

father of the victim's child, he could mitigate the consequences of his actions by "fulfilling his responsibilities as a father."

The trial court acknowledged that sentences involving incarceration were prioritized for convicted felons who "commit the most severe offenses possessing criminal histories evincing a clear disregard for the laws and morals of society and who show a failure of past efforts of rehabilitation." The court recognized that the sentence imposed should be the least severe measure necessary to achieve the purpose for which it was being imposed and should be no greater than that deserved for the offense committed.

Relative to the length of the Defendant's sentence in Count 2, aggravated assault involving strangulation, the trial court found that the Defendant should be sentenced to five years as a Range I, standard offender. The court continued, "Since he has . . . two months short of a calendar year [in jail credit], the [c]ourt is going to sentence him to five years – sentence him to time served on that five years, place him on five years of supervised probation." Shortly thereafter, the following exchange occurred:

> [DEFENSE COUNSEL]: We just weren't sure about Your Honor's statement, five years time served. Are you saying suspend all but time served?
>
> THE COURT: Yeah. Suspend all but time served.
>
> [DEFENSE COUNSEL]: So four years probation. One year—
>
> THE COURT: No. Still five years probation.
>
> [DEFENSE COUNSEL]: Okay. So it's not a split [confinement], you're saying. Understood.

After the court briefly addressed the sentence in Count 1, the prosecutor asked the court, "And then the probation will be only for Count 2?" The court responded, "Yeah, for five years," and affirmed that the sentence in Count 1 was to be served in incarceration.

Relative to Count 1, false imprisonment, the court imposed a concurrent sentence of eleven months, twenty-nine days in incarceration. The court ordered the Defendant to be screened for eligibility for the Day Reporting Center and noted that the Defendant needed to address his employment status and anger management issues. The Defendant filed no motion for a new trial and timely appealed his sentence.

<u>ANALYSIS</u>

The Defendant's sole issue on appeal is whether the trial court abused its discretion in Count 2, aggravated assault involving strangulation, by setting the length of the Defendant's sentence at five years. The State responds that no abuse of discretion occurred.

The Sentencing Reform Act was enacted in order "to promote justice" by ensuring that every defendant "be punished by the imposition of a sentence justly deserved in relation to the seriousness of the offense." Tenn. Code Ann. § 40-35-102. In order to implement the purposes of the Sentencing Reform Act, trial courts must consider several sentencing principles. The sentence imposed for an offense "should be no greater than that deserved for the offense committed" and "should be the least severe measure necessary to achieve the purposes for which the sentence is imposed." Tenn. Code Ann. § 40-35-103(2), (4). Thus, before a trial court imposes a sentence upon a convicted criminal defendant, it must consider: (a) the evidence adduced at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; (f) any statistical information provided by the Administrative Office of the Courts as to Tennessee sentencing practices for similar offenses; (g) any statement the defendant wishes to make in the defendant's own behalf about sentencing; and (h) the result of the validated risk and needs assessment conducted by the department and contained in the presentence report. Tenn. Code Ann. § 40-35-210(b).

As a preliminary matter, defense counsel cites to <u>State v. Gomez</u>, 163 S.W.3d 632, 653-64 (Tenn. 2005), <u>cert. granted, judgment vacated</u>, 549 U.S. 1190 (2007), for the proposition that this court's standard of review in sentencing is to "determine if the sentences were imposed in violation of a 'clear and unequivocal rule of law.'" The quoted language is not relevant here because it deals with a case in which the defendants' sentencing issue was not properly preserved and consequently was analyzed only for plain error. <u>Id.</u> at 649-650. In this case, the Defendant has appropriately preserved his issue for plenary review.

In <u>State v. Bise</u>, 380 S.W.3d 682, 707 (Tenn. 2012), our supreme court held that when an accused challenges the length and manner of service of a sentence, this court reviews the trial court's sentencing determination under an abuse of discretion standard accompanied by a presumption of reasonableness. Accordingly, this court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles

listed by statute." Id. 709-10. Moreover, under such circumstances, appellate courts may not disturb the sentence even if we had preferred a different result. See State v. Carter, 254 S.W.3d 335, 346 (Tenn. 2008). The burden of showing that a sentence is improper is upon the appealing party. See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.; see also State v. Arnett, 49 S.W.3d 250, 257 (Tenn. 2001).

The Defendant contends that the court erred by sentencing the Defendant to more than the statistical average of four years for a Class C felony, arguing that the court failed to take into account the victim's positive remarks about his character and that "nothing in the record" justified the court's choosing a longer sentence. The Defendant notes that "the evidence at [t]rial, and the sentencing hearing, were, but for the crimes, mostly positive things about the [Defendant]." The Defendant also asserts that the court should have applied several mitigating factors, stating the following:

> The facts surround[ing] the incident were that the [Defendant] was having an extended argument with the [v]ictim about her continuing to live at his residence . . . . [The victim] refused to leave and when she refused to vacate the parties started throwing food at each other until the matter broke down into further physical altercations . . . . Any [D]efendant who was being assaulted with food by a trespasser, who refused to leave, creates a strong provocation on that [D]efendant. Tenn. Code Ann. [§] 40-35-113(2) [("The defendant acted under strong provocation.")].

Firstly, the record reflects that the Defendant did not request the application of any mitigating factors during the sentencing proceedings, and he raises this argument for the first time on appeal; consequently, his issue in this regard has been waived. Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."). Secondly, we note without further comment that the Defendant misstates the evidence when he avers that the victim refused to leave the trailer; the only testimony regarding the incident was that of the victim, who clearly stated numerous times that the argument arose from her desire to leave and that the Defendant physically prevented her from doing such.

At any rate, the misapplication or failure to apply a mitigating or enhancement factor are not grounds for this court to reverse a sentence so long as the trial court's sentence otherwise complies with the purposes and principles of sentencing. See State v. Fusco, 404 S.W.3d 504, 546 (Tenn. Crim. App. 2012) (quoting Bise, 380 S.W.3d at 706-07) ("So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed by the trial court within the appropriate range

–12–

should be upheld."). Here, the trial court carefully considered the purposes and principles of sentencing, determined that two enhancement factors and no mitigating factors applied, and concluded that an in-range sentence of five years was appropriate. The record amply supports the court's imposition of an above-average in-range sentence: The Defendant had a substantial criminal history, including three prior convictions for assault; he was on probation at the time he committed the offenses in this case; and his Strong-R assessment rated him as a high risk for violence. We note that the court acted with restraint and deference to the legislature's stated priority of reserving prison space for the worst offenders by granting the Defendant yet another opportunity for probation—based upon the Defendant's previous violations of probation, his poor social history and character, and his assessed risk to reoffend, the court would have been well within its discretion to deny alternative sentencing. The Defendant is not entitled to relief on this basis.

In addition, although the judgment in Count 1, false imprisonment, contains a hand-written notation reading "time served," the judgment form box for pretrial jail credit has not been completed on either judgment form. On remand, the judgments should be amended to include the dates between which the Defendant accrued jail credit.

CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed and the case remanded for the entry of amended judgments.

_____
D. KELLY THOMAS, JR., JUDGE

–13–